UNITED STATES of America,

v.

Frank SERAFINI, et al., Defendants.

No. 3:CR–97–225.

United States District Court,
M.D. Pennsylvania.

April 7, 1998.

Bruce Brandler, Asst. U.S. Atty., Harrisburg, PA, for U.S.

Daniel T. Brier, Sal J. Cognetti, Scranton, PA, for Defendants.

## MEMORANDUM

VANASKIE, District Judge.

Defendant Frank Serafini has been indicted for allegedly making perjurious statements to the grand jury in violation of 18 U.S.C. § 1623. This charge is the last count in a 140–count indictment that accuses four other co-defendants of conspiring to and violating, *inter alia*, the Federal Election Campaign Act, 2 U.S.C. §§ 431, *et seq.*, by, *inter alia*, funneling corporate funds into campaign committees of various candidates for federal elected offices.[1] The indictment accuses Mr. Serafini of falsely testifying to the grand jury that he was not reimbursed for a $1,000 contribution he made to the Dole for President Committee, and that, other than a $2,000 check payable to him from his nephew, Michael Serafini, he was unaware of any other check "connected to" the grand jury's investigation.

Mr. Serafini has filed a motion to dismiss the indictment. (Dkt. Entry 46.) As the government observes, the challenge to the indictment requires separate consideration of each of the five alleged perjurious statements charged in Count 140. Because Mr. Serafini has demonstrated that the grand jury questioning in regard to his knowledge of other checks related to the alleged contribution scheme was so ambiguous and unclear as to preclude a perjury conviction, his motion to dismiss the indictment as to his knowledge of other checks will be granted. In all other respects, his motion to dismiss the indictment will be denied as he has failed to demonstrate that the indictment is fatally defective under the applicable precedents.

Mr. Serafini has also filed a motion for a bill of particulars (Dkt. Entry 30), and a motion for misjoinder or, alternatively, for severance. (Dkt. Entry 48.) Because the indictment provides sufficient information concerning the alleged perjurious conduct, the motion for a bill of particulars will be denied. Because Mr. Serafini has demonstrated that severe prejudice will result if he is forced to defend himself in a joint trial with the other codefendants, the motion for severance will be granted, without deciding the misjoinder issue.

## I. BACKGROUND

On October 7, 1997, a federal grand jury in this District returned a 140–count indictment against six defendants, Renato P. Mariani,

---

1. A fifth co-defendant, Robert Giglio, was also only charged with perjury.

Michael L. Serafini, Leo R. Del Serra, Alan W. Stephens, Robert Giglio, and Frank Serafini. The first 134 counts essentially concern alleged illegal campaign contributions under the Federal Election Campaign Act. Counts 135 through 138 concern obstruction of justice charges leveled against defendants Michael L. Serafini and Leo R. Del Serra. Count 139 charges defendant Robert Giglio with having presented perjured testimony to the grand jury. This is the only count in which Giglio is named as a defendant. Count 140 levels the same charge against defendant Frank Serafini, who is a Pennsylvania State Representative, having been elected to represent the 114th Legislative District in Pennsylvania. Defendant Frank Serafini is named as a defendant only in Count 140.[2]

As the exact nature of the alleged perjurious statements are challenged by defendant Frank Serafini's motions, they must be produced verbatim. To facilitate reference, however, this Court will number the statements so that they need not be reproduced throughout this Memorandum.[3] The alleged perjurious statements are as follows:

### Statement 1.

Q: And did you bring any documents pursuant to the subpoena that required your appearance here today?

A: I don't have the documents, I don't have documents with me but the subpoena, because the subpoena didn't require any. The way I read the subpoena, I have a copy of it, all documents relative to political contributions you were reimbursed for, *and I was not reimbursed for any contributions.*[4] (Indictment (Dkt. Entry 1) ¶ 4, at 57.)

### Statement 2.

Q: Well, then why wouldn't he reimburse you for you Dole contribution under the same rationale?

A: Because I wanted to contribute to Bob Dole.

Q: And you didn't want to fix his car?

A: Not necessarily, would you?

Q: I don't know.

A: And $2,000 for a thousand dollar contribution.

Q: $2,000 for what?

A: $2,000 . . .

Q: What was that last statement?

A: $2,000 this check is for, if I see it correctly?

Q: Right.

A: And my check here is for a thousand dollar contribution?

Q: Right. So you are saying you don't know what the other thousand dollars is for?

A: *I would not relate it to that, in my mind.*

Q: What would you relate?

A: In my mind.

Q: What would you relate it for?

A: *To something else, whether it was fixing his car, whether is was something else.* It could be something else and that is just what I am saying to you now, because when he asked me for a thousand dollar contribution I wrote a check for a thousand dollars, I found no problem with that, I was happy to be able to do it. (Indictment (Dkt. Entry 1) ¶ 4, at 57.)

### Statement 3.

Q: Is there any check that you received that reimbursed you other than that $2,000 check for your contribution?

A: No.

Q: Is there another check that you are aware of that is connected to this investigation, to this Dole contribution, other than the $2,000?

---

**2.** The government's characterization of Frank Serafini as an unindicted co-conspirator was ordered stricken from the indictment. (Order dated Jan. 14, 1998 (Dkt. Entry 132).)

**3.** Subsequent reference to these statements will be as follows: "Statement 1," etc.

**4.** The underlined parts of the quotations are the testimony that is alleged to be perjurious. (Indictment (Dkt. Entry 1) ¶¶ 5, 59 .)

A: *Not other than what you have shown me today, no.*

(Indictment (Dkt. Entry 1) ¶ 4, at 57.)

**Statement 4.**

Q: And you have no knowledge, as you sit here today, or is it accurate that as you sit here today you have no knowledge why Michael Serafini issued that check to you for $2,000?

A: *I still think the $2,000 would have been just around the time that I was fixing his car, the transmission was gone. I was fixing it, it is just about that amount of money that would have paid for the repair. It could have been for a number of things, but it certainly does not relate to me contributing to Bob Dole. I contribute quite frequently to candidates and those kind of amounts.*

(Indictment (Dkt. Entry 1) ¶ 4, at 57.)

**Statement 5.**

Q: I am going to wrap this up. I want to make sure we are absolutely on the same page here, there is no misunderstanding. It is your testimony under oath, as you sit here today, that as far as you know, there is no connection between the check that you wrote to Dole for President dated April 27 of '95 for $1000, check 3781, and the check that you received from the Michael Serafini–Melinda Marcotte account dated April 25th of '95 for $2,000, it is your testimony that there is no connection between these two items?

A: *In my mind I can honestly say that there is no connection between those two checks, the thousand and the two thousand. In my, I mean in my mind I know I contributed to Bob Dole because I wanted to contribute to him without reimbursement. The $2,000, I truly believe I cashed that check and spent it to, for another reason, I am assuming it was when I was fixing his vehicle.*

Q. Are you drawing any distinctions when you answer that question similar to the distinctions you drew when you were interviewed by Frank Schultz [sic] regarding whether or not people were hallucinating, or were a hundred percent incorrect

that you were receiving a per ton fee from Empire Landfill, are you drawing a similar kind of fine line distinction here?

A. Let me say this. When I am talking to Frank Schultz [sic] I am not under oath. Frank Schultz [sic] questions me and I give him an answer. There is no fine line distinctions here as there was when, as there is when I talk to Frank Schultz [sic]. Frank Schultz [sic] is an entirely different person, he is not a U.S. Attorney.

(Indictment (Dkt. Entry 1) ¶ 4, at 57.)

The indictment alleges that the above underscored testimony was false in that:

(1) Defendant Michael L. Serafini issued a check dated April 25, 1995 payable to Frank Serafini in the amount of $2,000 which was subsequently negotiated on May 1, 1995 and which reimbursed Frank Serafini for his $1,000 contribution to the Dole Committee and also reimbursed him for the expense of reimbursing Thomas Harrison, his former legislative aide, $1,000 for a contribution Thomas Harrison made to the Dole Committee in the amount of $1,000 which was solicited by Frank Serafini and reimbursed by Frank Serafini; and (2) there were at least two other checks connected to this transaction other than what was displayed during the grand jury proceeding, i.e., a $1,000 check dated April 27, 1995 drawn on the account of Thomas G. or Maureen J. Harrison payable to the Dole Committee which was solicited and received by Frank Serafini, and a $1,000 check dated April 27, 1995 drawn on the account of Frank A. Serafini and Louis Serafini payable to cash which was used to reimburse Thomas Harrison for his Dole Committee contribution.

(*Id.* ¶ 5, at 59.)

## II. DISCUSSION

### A. Motion to Dismiss the Indictment

 Defendant Frank Serafini argues that the questioning of him in the grand jury was fundamentally unfair in that in was ambiguous, unclear and imprecise. It is well-established that to sustain a perjury charge, a prosecutor must present careful questioning in order to demonstrate that the defen-

dant was aware of the meaning of the question and the falsity of his answer. As noted by the United States Supreme Court:

> If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination. . . . The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.

*Bronston v. United States*, 409 U.S. 352, 358–60, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). In this regard, the meaning of the prosecutor's question must be clear and a court may not assume a particular meaning. *United States v. Tonelli*, 577 F.2d 194, 200 (3d Cir.1978) (observing that "especially in perjury cases, defendants may not be assumed into the penitentiary"); *see also United States v. Slawik*, 548 F.2d 75, 84 (3d Cir.1977) ("if the prosecutor never asks the critical question and never presses for an unequivocal answer the defendant may not be convicted for false swearing").

■ Further, an indictment must set forth the particular falsehood with clarity along with the government's factual basis for asserting that it is false, such that a jury can determine the falsity of the statement. *Tonelli*, 577 F.2d at 200. A jury cannot be allowed to speculate on (1) the prosecutor's meaning, (2) the defendant's meaning, and (3) the grand jury's meaning. *Slawik*, 548 F.2d at 84. The indictment must evidence a meeting of the minds. *Id.*[5]

■ The Third Circuit has summarized its perjury jurisprudence as follows:

> As a general rule, the fact that there is some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statements prosecution. Normally, it is for the petit jury to decide which construction the defendant placed on the question. However, these general rules are not without limit, and if a question is excessively vague or 'fundamentally ambiguous,' then the answer to such a question may not, as a matte of law, form the basis of a perjury·or false statement prosecution. The purpose behind the rule of fundamental ambiguity is twofold 1) to preclude convictions that are grounded on little more than surmise or conjecture, and 2) to prevent witnesses . . . from unfairly bearing the risks associated with the inadequacies of their examiners. . . . It is difficult to define with precision the point at which a question becomes so ambiguous that it is not amenable to jury interpretation. *We have stated that the point is reached "when it [is] entirely unreasonable to expect that the defendant understood the question posed to him." Other courts have said that " [a] question*

5. In *Tonelli*, the defendant was called before the grand jury to testify about his participation in the management of a pension fund. 577 F.2d at 197. Initially, the defendant was questioned about whether he had been involved in the "placement" of monies into the pension funds. *Id.* The defendant testified that he had not been involved in the "placement." *Id.* The prosecutor then questioned the defendant as to whether he had recommended that the pension fund purchase certain securities, to which the defendant stated that he had made some recommendations. *Id.* Although the defendant's initial denial was false, he later clarified his answer and admitted that he had participated in the pension fund management. The government, however, limited the language in the indictment to include only the defendant's initial denial of participation without including the prosecutor's more specific questions and the defendant's admission that he had some involvement. The Third Circuit determined that an indictment containing such limited information was misleading and insufficient. *Id.* at 198.

In *Tonelli*, the prosecutor also questioned the defendant as to whether he had ever "handled" a pension fund check. *Id.* at 199. In his questioning, the prosecutor suggested that "handled" meant physically touched the check. *Id.* Relying upon this meaning, the defendant stated that he could not remember whether he had touched the check. The prosecutor had in his possession a cover letter signed by the defendant which had accompanied the check. The prosecutor never confronted the defendant with the cover letter. Because the defendant was never asked whether he directed a third person to mail the check with the letter and the defendant was under the impression that "handled" meant physically touched, the Third Circuit dismissed the indictment because the prosecutor had failed to "nail" down the defendant's testimony to determine the extent of his participation in mailing the check. *Id.* at 200. ("To sustain a perjury charge based on the ambiguous line of questioning used here would require us to assume Tonelli interpreted 'handle' to include more than 'touching' ").

*is fundamentally ambiguous when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'"*

*United States v. Ryan,* 828 F.2d 1010, 1015 (3d Cir.1987) (citations omitted) (emphasis added) (finding the word "address" in a credit application ambiguous as a person could have more than one address).

Although a prosecutor must be careful to establish a clear meaning as to the critical terms that form the basis of a perjury charge, some words are so common that there cannot be any ambiguity. *See United States v. Long,* 534 F.2d 1097, 1100 (3d Cir. 1976). "Where words or phrases of common usage form the predicate of a perjury charge and are arguably susceptible to more than one construction, whether the former witness and his examiner had a shared understanding with respect to them is properly left an issue for trial." *United States v. Hilliard,* 436 F.Supp. 66, 71 (S.D.N.Y.1977) (finding the words "business dealings" and "dealings" sufficiently definite to support a perjury indictment); *see also United States v. Long,* 534 F.2d 1097, 1100 (3d Cir.1976) (finding that the terms "bribes," "kickbacks," and "payoffs" were not so ambiguous as to require the dismissal of the indictment); *United States v. Chapin,* 515 F.2d 1274, 1280 (D.C.Cir.) ("When the questions involved here are considered in the context of both the purpose of the grand jury investigation, which was known to [the defendant], and the series of questions actually asked, we cannot say that the words ['distribute' and 'express any interest'] could not be subject to 'a reasonable and definite interpretation by the jury.'"), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *United States v. Ceccerelli,* 350 F.Supp. 475, 478 (W.D.Pa. 1972) ("We do not think that, in context, 'met with' and 'regular' were so cryptic as to prevent a meeting of the minds between the defendant and his questioner."). In this regard, the common sense meaning of the words must also be considered in light of the knowledge of the witness at the time of the testimony:

But, considered in the context of the entire examination of the defendant, the question was clear and unambiguous. The grand jury was investigating what had happened in the past, and [the defendant] was being interrogated about his present knowledge of those past events.... Words clear on their face can be interpreted in various ways when "subjected to ingenious scrutiny after the fact." The words used were to be understood in their common sense, not as they might be warped by sophistry or twisted in pilpul.

*United States v. Crippen,* 570 F.2d 535, 537 (5th Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979); *see also United States v. Reilly,* 33 F.3d 1396, 1418 (3d Cir.1994) (finding that the question posed to the defendant was not ambiguous because it was reasonable to expect the defendant to understand the question's meaning).

Finally, it is also necessary to consider the defendant's use of challenged terms to determine whether he understood the meaning of the questions posed by the prosecutor. As noted by the Third Circuit:

That the prosecutor [and the defendants] understood each other is evidenced by the defendants' *unequivocal denials* that their behavior merited the labels in question. At no time in the course of their testimony did the [defendants] *manifest the slightest uncertainty or confusion* as to the meaning of these terms. *Indeed, the defendants themselves used the terms in their vehement denials.* The record reveals a meeting of the minds on the definition of the words.

Moreover, the defendants did not confine themselves to denying the accusations of the prosecutor. They affirmatively characterized their transaction as the purchase and sale of raffle tickets when, as the Government alleges, they knew that the money was in return for the garbage contract.

*Long,* 534 F.2d at 1100 (emphasis added).

These principles will now be applied to the five separate alleged perjurious statements set forth above.

As to Statement 1, the prosecutor had simply asked Serafini whether he had brought any documents pursuant to the subpoena. Mr. Serafini independently and unequivocally responded by stating that he had not brought any documents because he was not reimbursed for any contributions. Despite his protestations to the contrary, there is nothing ambiguous in the question or the answer. Mr. Serafini had appeared several months earlier at a prior meeting of the grand jury and asserted his Fifth Amendment privilege against self-incrimination. The government sought and obtained a grant of immunity for his testimony. When Mr. Serafini appeared for a second time before the grand jury, he was undoubtedly well aware of the information that the grand jury was seeking. Further, the grand jury subpoena also placed him on notice that the grand jury was seeking information concerning any reimbursements that he received for political contributions. Given this knowledge and the context of the question, it cannot be said that this question was so ambiguous that Statement 1 must fail.[6]

As to Statement 2, Mr. Serafini contends that his use of the pronouns "it" and "that" make the indictment ambiguous and uncertain. Consideration of the entire context of the conversation, however, compels the conclusion that there was no fundamental misunderstanding between the prosecutor and the witness. It was Mr. Serafini who questioned the prosecutor as to why he would receive a $2,000 check from defendant Michael Serafini for only a $1,000 contribution to the Dole Committee. The prosecutor followed up this line of questioning by asking Mr. Serafini what the additional $1,000 represented. Frank Serafini replied: "I would not relate it to that, in my mind." The "it" in this answer clearly refers to the additional $1,000, while the "that" plainly refers to the contribution to the Dole Committee. Any other interpretation of Frank Serafini's re-

sponse would strain logic and defeat common sense. While a prosecutor is required to use precise questions, requisite precision can be inferred from the context. *See, e.g., Reilly,* 33 F.3d at 1418. It is not essential that the prosecutor avoid pronouns or make each inquiry stand on its own without reference to the questions that precede or follow. The questioning, considered in context, was not " 'so ambiguous that it is not amenable to jury interpretation' because it is reasonable 'to expect that the defendant understood the question.' " *Reilly,* 33 F.3d at 1418. The exchange in Statement 2, when viewed in the light of Frank Serafini's knowledge of the investigation and his initiation of the conversation about the additional $1,000, requires a conclusion that Statement 2 is sufficiently clear to support a charge of perjury.

Both Statement 4 and Statement 5 also provide a sufficient basis for a perjury charge. In Statement 4, the prosecutor plainly asked Frank Serafini whether he knew why defendant Michael Serafini issued him a $2,000 check. Mr. Serafini responded unequivocally that the $2,000 check did not relate to his contribution to the Dole Committee. Further, in Statement 5, the prosecutor attempted to "wrap up" the testimony to ensure that Mr. Serafini was on "same page" as the prosecutor. Defendant Frank Serafini again responded that there was no connection between his contribution to the Dole Committee and the $2,000 check from defendant Michael Serafini. A review of the indictment demonstrates that men of ordinary intelligence could agree that the prosecutor and Frank Serafini had a mutual meeting of the minds. Although Mr. Serafini has adamantly argued alternative definitions premised upon carefully crafted linguistic distinctions, such arguments are properly made before the petit jury—not to this Court. *Id.* at 1415–18.

As to Statement 3, however, the indictment fails to demonstrate specific and

---

**6.** Mr. Serafini also criticizes the government for not immediately following up on this statement that he was not reimbursed. Instead, the government moved forward to elicit background information. This argument must also fail. The government eventually returned to the subject and questioned Mr. Serafini as to his reimburse-

ment for political contributions. Thus, the government is not relying solely upon this statement for its perjury charge. Second, the statement did not require any follow-up questioning. Frank Serafini volunteered the unambiguous statement that he had not been "reimbursed."

unambiguous questioning. In this regard, the prosecutor questioned Frank Serafini whether he received any reimbursement checks other than the $2,000 check from defendant Michael Serafini. After Mr. Serafini responded that he had not received any other reimbursement checks, the government questioned him as to whether he was "aware" of "another check" connected to "this investigation, to this Dole contribution, other than the $2,000." Mr. Serafini responded by stating: "Not other than what you have shown me today, no." The government contends that there were at least two other checks that Frank Serafini should have identified in response to this question: (1) the check that Thomas Harrison wrote for $1,000 to the Dole Committee; and (2) a check for $1,000 made out to "cash" from the account of Frank Serafini and Louis Serafini which the government contends Frank Serafini used to reimburse Thomas Harrison.

When viewed in context, this single question cannot reasonably be expected to have triggered in the witness' mind an understanding that the government was inquiring of *Frank Serafini's* reimbursement of Mr. Harrison. The focus of the prosecutors questions was on Frank Serafini's receipt of the check for $2,000 from Michael Serafini as reimbursement for Frank's Dole Committee contribution. In the context of this questioning, Frank Serafini could not reasonably be expected to understand that the prosecutor was asking a broad, open-ended question regarding checks from third parties to the Dole Committee. Significantly, there was no specific follow up question to demonstrate the breadth of the prosecutor's inquiry. On the contrary, the question immediately following the alleged perjurious statement, which was not reproduced in the indictment, returned to the question of Frank Serafini having been reimbursed for his contribution:

> Q: Did you receive any other money, whether by cash, or check, or any other form from Michael at or around the time period that you made your Dole contribution other than this $2,000 check?

A: I don't specifically remember, however, we transfer money back and forth quite often for different reasons and I can't honestly say that there wasn't some kind of transfer, I mean, we do it all of the time.

(Def's Supp. Brf. (Dkt. Entry 47) at 32.) This follow up question demonstrates that the prosecutor and Frank Serafini were concerned only with whether he received other moneys or checks from defendant Michael Serafini, not whether Frank Serafini had solicited a check from someone else or whether he had written a check to reimburse someone else.

The prosecutor could have asked Frank Serafini whether he had ever solicited or reimbursed another person for contributions to the Dole Committee and whether any checks existed to evidence such actions. The prosecutor could have asked him whether he had solicited or received any other checks from third parties in connection with the alleged conspiracy. These simple straightforward questions, which would have extinguished any potential ambiguity, were never asked.[7]

The prosecutor plainly led Frank Serafini to understand that he was being questioned as to whether he had personally received any other reimbursement checks in connection with his contribution to the Dole Committee. If the prosecutor wanted to shift the focus of his questioning, it was incumbent upon him to do so with clarity. A single, unspecific question, viewed from hindsight as "open-ended," simply cannot support a claim for perjury when its context unambiguously demonstrates a much narrower focus. "A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different that which its context clearly shows." *Tonelli*, 577 F.2d at 198. Stated otherwise, it would be unreasonable to expect that Mr. Serafini would have understood that the prosecutor's focus had shifted from Mr. Serafini's receipt

---

7. Furthermore, the prosecutor never mentioned the name Thomas Harrison, although it was known at the time of Frank Serafini's grand jury testimony that Harrison had contributed to the Dole Committee at about the same time that Frank Serafini had contributed, and that Harrison was an aide to Mr. Serafini.

of reimbursement to Mr. Serafini having reimbursed a contributor.

■ Our Court of Appeals has made it clear that the issue of whether a question is fatally ambiguous is to be ascertained from the context of the interrogation. Just like an indefinite question, such as "you have no idea," may support a perjury conviction when viewed in context, *Reilly*, 33 F.3d at 1417–18, so too may the question in this case—"is there another check that you are aware of that is connected to this investigation, to this Dole contribution, other than the $2,000"—be fundamentally ambiguous when considered in its context. While one may speculate that both the prosecutor and defendant Frank Serafini understood that this isolated question called upon Frank Serafini to reflect on his solicitation of a contribution which he then reimbursed, guilt by speculation and conjecture cannot be allowed. *Tonelli*, 577 F.2d at 200 (observing that "especially in perjury cases, defendants may not be assumed into the penitentiary").

This question also has other problems that make it an unsuitable predicate for a perjury prosecution. For example, it is compound—inquiring of checks connected both to "this investigation" and to "this Dole contribution." More importantly, it is limited to Mr. Serafini's present "awareness" of another check, i.e., whether he had in his mind at that time other checks connected to either the investigation or the Dole contribution. His testimony, therefore, was only that he was unaware at that time of any other checks. The testimony is not an unequivocal denial of the existence of any other checks, as the government claims, but is instead an expression of no present awareness of other checks. Because the inquiry immediately preceding and following this question was limited to Frank Serafini's receipt of reimbursement, it would be unreasonable to presume that he should have understood that the focus of the inquiry had shifted to his reimbursement of others so that he should be expected to recall in that instant a contribution made by his legislative aide and a check made payable to cash that was allegedly the reimbursement for the legislative aide's contribution. To allow the government to prosecute for perjury under

these circumstances runs counter to the Third Circuit's decisions in *Tonelli* and *Slawik*. Accordingly, Statement 3 set forth above will not support a perjury prosecution.

■ While, on the one hand claiming that the questioning as to Statement 3 could not support a perjury prosecution, Mr. Serafini contends on the other hand that his answer to that question precludes a perjury prosecution as to the other statements. This is so, according to Mr. Serafini, because his answer to the question involved in Statement 3 was literally true. The question in Statement 3 asked whether there was another check connected to the investigation *other than* the $2,000 check from Michael Serafini. Frank Serafini asserts that his negative answer to his question implies that he was acknowledging the $2,000 check to be connected to the investigation, i.e., reimbursement to him for his contribution to the Dole Committee. This strained effort to bring this case within *Bronston*'s proscription against a perjury prosecution based upon a literally true but misleading response is unavailing. Given Mr. Serafini's unequivocal testimony on several occasions that he had not been reimbursed, the negative answer to the question involved in Statement 3 cannot be regarded as an admission of receipt of reimbursement. Nor is this a case where additional questioning was required of the prosecutor to clarify any ambiguity. Mr. Serafini made it clear at the outset of the interrogation and at its closing that he had not been reimbursed for his contribution to the Dole Committee. These unequivocal assertions support a perjury prosecution, notwithstanding Frank Serafini's contention that he actually admitted to the grand jury receipt of reimbursement for his contribution to the Dole Committee.

Mr. Serafini insists, however, that his unequivocal denial of having been reimbursed for his Dole Committee contribution cannot support a perjury prosecution because the indictment's "truth averments" "inextricably connects" Thomas Harrison's contribution and receipt of reimbursement "to the alleged falsity of Mr. Serafini's response," (Def's Supp. Brf. (Dkt. Entry 47) at 9), but Mr. Serafini was never specifically questioned about the Harrison transaction. Mr. Serafini

contends that the failure of the prosecution to inquire about Mr. Harrison is "the basic incurable deficiency" in the indictment. (Reply Brf. (Dkt. Entry 118) at 27.)

Contrary to Mr. Serafini's assertions, the failure to question him about Mr. Harrison neither precludes consideration of the indictment's "truth averments" for purposes of assessing the falsity of his testimony nor renders the indictment incurably defective. The indictment explains that Mr. Serafini's testimony concerning the $2,000 check from Michael Serafini was untruthful because it represented reimbursement of both Frank Serafini's and Thomas Harrison's contribution. While Mr. Harrison's involvement may be essential to the "truth averment," his involvement was not pertinent to Mr. Serafini's unequivocal testimony that *he* had not been reimbursed. In other words, Thomas Harrison's involvement is not implicated by Frank Serafini's testimony at the inception of the grand jury proceeding that "I was not reimbursed for any contributions." Moreover, it was Frank Serafini who volunteered that the $2,000 check from Michael Serafini was not related to Dole Committee contributions, but instead concerned some car repair bills or something else. This is not a case like *Tonelli*, where an imprecise answer could have been clarified by further questioning or by pinning the witness down. It was Frank Serafini who volunteered an explanation for the Michael Serafini check that was inconsistent with it serving as reimbursement for a contribution to the Dole Committee. This is also not a case of the interrogator trapping the witness into perjury, like *Slawik*. Nor is this a case like *Bronston*, based upon a contention that literally true but misleading answers were supplied. In cases like *Tonelli*, *Bronston*, and *Slawik*, there is a reasonable basis for concluding that more precise interrogation would either illuminate perjury or preclude it. But in this case, questioning Mr. Serafini about the Harrison contribution and reimbursement was not necessary to clarify Mr. Serafini's unequivocal denial of reimbursement.

8. For these reasons, there is no need to conduct an evidentiary hearing to determine when the government came into possession of the Harri-

It must be remembered that the grand jury is an *investigative* body. When witnesses appear before it, there is no obligation to tell the witness what some other person may have told it or identify what document it possesses. *Cf. United States v. Williams*, 504 U.S. 36, 55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (finding that district court's supervisory power over grand jury did not extend so far as to permit it to impose upon the prosecutor the legal obligation to present exculpatory evidence). The grand jury is entitled to inquire of the witness' knowledge, and after it has gathered all pertinent evidence, to assess the witness' truthfulness in relation to matters material to its investigation.[8] The fact that the "truth averment" includes information that was not presented to the defendant does not insulate the witness from a perjury prosecution so long as the alleged perjurious statements stand in stark contrast to the truth averment. *Slawik*, 548 F.2d at 83–84 (indictment must "set forth the precise falsehood and the factual basis of its falsity with sufficient clarity to permit a jury to determine its veracity [and materiality]"). Count 140 of the indictment in this case meets this standard. Accordingly, the failure to question Mr. Serafini about Mr. Harrison does not warrant dismissal of the indictment.

Another argument advanced by Mr. Serafini to defeat the indictment is that the prosecutor should have defined the term "reimbursement." He insists that he understood "reimbursement" to require a "causal connection" between his decision to donate to the Dole Committee and his receipt of the $2,000 check from defendant Michael Serafini. He contends that he did not believe that he was receiving a reimbursement because he wanted to contribute to the Dole Committee and he would have done so regardless of defendant Michael Serafini's actions. Essentially, Frank Serafini argues that because he contributed to the Dole Committee without expectation of reimbursement, he could testify truthfully that he did not believe that he was reimbursed for his contribution because

son contribution check and the check drawn from the Frank Serafini or Louis Serafini account.

there was no "casual connection" between his decision to contribute and the alleged reimbursement.

Although Mr. Serafini is free to make this argument to the petit jury, it cannot defeat the indictment. The term reimbursement means "the action of reimbursing." *Webster's Third Int'l Dictionary* 1914 (1993). The term "reimburse" is defined as "to pay back (an equivalent for something taken, lost or expended) to someone." *Id* . As it is used in its common parlance, reimbursement means the delivery of money to a person to pay back that person for money that the person expended for some matter. Given this common meaning of the term used by the prosecutor, it is reasonable to conclude that Mr. Serafini understood that the prosecutor wanted to know whether defendant Frank Serafini had been reimbursed for his contributions, i.e., whether any one had given him money for the Dole contribution. Mr. Serafini can attempt to convince the petit jury as to his interpretation of the questioning, but the use of the term "reimbursement" fails to rise to the level at which it would be unreasonable for men of common intelligence to understand the questions regarding "reimbursement." *See United States v. Marchisio*, 344 F.2d 653, 661–62 (2d Cir.1965) ("While 'arrangement,' 'agreement,' and ['reimbursement'] connote different meanings in different situations, they are precisely defined in dictionaries, are terms of common usage, and, under the circumstances, were subject to a reasonable and definite interpretation by the jury."). As noted in the cases cited herein, linguistic legerdemain does not render an indictment defective; at best, it creates a question for the trier of fact. Accordingly, the prosecutor's failure to define the term reimbursement does not warrant dismissal of the indictment.[9]

Another basis for dismissing Count 140 posited by Mr. Serafini is that he made it clear on numerous occasions that he did not believe that he was reimbursed "in his mind." The government will bear the burden of demonstrating that defendant Frank Serafini knew "in his mind" that the $2,000 check from defendant Michael Serafini was a reimbursement. The phrase "in my mind" is not a talisman that a grand jury witness can brandish to ward off potential perjury prosecutions and use as a license to lie. In effect, every perjury charge requires proof that the defendant knowingly made a false statement under oath. Mr. Serafini's use of the phrase "in my mind" does not change the government's burden of proof, nor does it warrant dismissal of the indictment.[10]

9. Mr. Serafini also contends that the indictment should be dismissed because the alleged false statements were not material to the grand jury's investigation. In this regard, defendant Frank Serafini reiterates his previous arguments in that "the vague questioning, the literal truthfulness of Mr. Serafini's responses, the prosecutor's decision to close the record in a permanently ambiguous state, and the out-of-context misleading use of Mr. Serafini's responses similarly renders meaningful review of the materiality element under § 1623 impossible." (Def's Supp. Brf. (Dkt. Entry 47) at 36–37.) This argument is without merit. The grand jury was investigating potential illegal campaign contributions by a corporate entity through conduit donors. Frank Serafini was questioned regarding his participation in this alleged illegal conspiracy. A determination as to whether Mr. Serafini was reimbursed for his contribution to the Dole Committee relates to the grand jury's investigation of illegal campaign contributions through conduit donors. In short, it cannot legitimately be maintained that the grand jury could not have reasonably found that Mr. Serafini's false statements regarding his alleged reimbursement were not material to the grand jury's investigation. As with the ambiguity argument, Mr. Serafini is free to make his materiality claim to the petit jury at trial. *See United States v. Gaudin*, 515 U.S. 506, 522, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (finding that question of materiality must be made by the petit jury, not the court).

10. Mr. Serafini also weakly contends that, by not including certain testimony in the indictment, the government implicitly accepted certain statements in the indictment as true, and that such acceptance of those statements warrants dismissal of the indictment. For instance, Mr. Serafini notes that at one point in the questioning, the following exchange took place:

Q: And were you reimbursed?
A: In my mine [sic] I was not reimbursed. I contributed to Bob Dole with my funds because I wanted to contribute to Bob Dole, just as I have contributed to numerous candidates. (Def's Supp. Brf. (Dkt. Entry 47) at 31.) Although this phrase was not included in the indictment, the government contends that such omission from the indictment does not equate to

■ Finally, Mr. Serafini argues that his due process rights have been violated as a result of the prosecutor's misconduct before the grand jury. In order for an indictment to be dismissed based upon prosecutorial misconduct, it must be demonstrated that such conduct "substantially influenced the grand jury's decision to indict" or that there is "grave doubt" that the decision to indict was free from the substantial influence of such conduct. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *see also United States v. Breslin*, 916 F.Supp. 438, 441 (E.D.Pa.1996) (applying the harmless error analysis in considering alleged misconduct before the grand jury). Mr. Serafini has set forth a litany of allegedly improper conduct on the part of the prosecutor as support for his due process claim. These allegations will be considered *sertiam*.

■ First, Mr. Serafini claims that the prosecutor told him on two occasions that he could only answer questions with a yes or no response. (Def's Supp. Brf. (Dkt. Entry 47) at 39.) This claim cannot support a due process violation. The government notes that it made this instruction because Frank Serafini made a non-verbal response to a question and that a verbal response was necessary for the record. Further, the record demonstrates that Mr. Serafini was allowed ample opportunity to explain his answers and often gave verbose responses.[11]

■ Second, Mr. Serafini alleges that the government improperly examined him regarding certain articles that appeared in the local media concerning his financial connection with Empire Sanitary Landfill. (*Id.*) In this regard, Frank Serafini contends that the government improperly insinuated political philosophy into the grand jury proceedings and attempted to curry favor with the local media. (*Id.*) A review of the grand jury transcript does not support this assertion. There is nothing to indicate that the government was questioning Mr. Serafini as to his political philosophy. Likewise, there is nothing to suggest that the government was attempting to curry favor with the local media. Instead, the questioning focused upon Mr. Serafini's financial connections with Empire Sanitary Landfill and his ·attempts to downplay this connection with the local media. This inquiry was relevant to the alleged campaign contribution conspiracy, and whether Mr. Serafini had been reimbursed for any contributions he may have made.

■ Third, Mr. Serafini claims that the prosecutor improperly questioned him regarding his personal relationship with his father, sister and other relatives "to engender suspicion and bias." (*Id* . at 40.) Given that defendant Michael Serafini is alleged to be one of the main co-conspirators and that other members of Mr. Serafini's family allegedly served as conduits and received. reimbursements, the prosecutor's questions concerning Frank Serafini's relationship with his family and the knowledge that he had regarding their involvement was relevant to the grand jury's investigation. Further, Frank Serafini drew his family into the proceedings when he indicated to the prosecutor that it was common for members of his family to transfer money back and forth to each other. For example, he explained the $2,000 check from defendant Michael Serafini as an example of the manner in which his family

---

an admission to the truth of the statement. Instead, the government represents that it did not want to overload the indictment with allegedly perjurious statements. Mr. Serafini has not cited any authority for the proposition that failure to charge every perjurious statement estops the government from prosecuting on some perjurious statements. The government ·has made clear that it alleges that Frank Serafini knew that he was being reimbursed for his contribution to the Dole Committee and that he provided false testimony to the grand jury regarding such reimbursement. The mere fact that the indictment has not listed every denial of reimbursement by

Mr. Serafini as a basis for the perjury charge cannot support dismissal of the indictment.

11. Mr. Serafini also complains that the prosecutor interrupted him on several occasions and refused to allow him to finish his answers. (*Id.*) As noted above, the transcript demonstrates that Mr. Serafini was allowed ample opportunity to explain his answers. Although there were undoubtedly instances in which the prosecutor interrupted Mr. Serafini, this was the result of the natural give and take of an examination of a witness. Therefore, Mr. Serafini's assertion that he was not allowed to completely answer the prosecutor's questions is without merit.

commonly shared money with each other. In any event, Mr. Serafini has failed to indicate how such questions would "engender suspicion and bias" on the part of the grand jury. Therefore, the questions concerning Frank Serafini's family members will not support a due process violation.

Fourth, Mr. Serafini alleges that his due process rights were violated when the prosecutor failed to ask a single question concerning Thomas Harrison or whether Frank Serafini had ever reimbursed anyone. (*Id.* at 40.) The prosecutor has represented that he did not have knowledge of Frank Serafini's solicitation of a contribution from and reimbursement to Thomas Harrison at the time that Frank Serafini was questioned. According to the government, this fact did not become apparent until Thomas Harrison testified a few days after Frank Serafini's appearance before the grand jury. The documentary evidence, consisting of Thomas Harrison's check to the Dole Committee and a check payable to cash from the account of Frank or Louis Serafini, does not so clearly implicate Frank Serafini as a conduit for reimbursement of Mr. Harrison as to have warranted that the prosecutor confront Frank Serafini with the documents, even if they were in the prosecutor's possession at the time of Frank Serafini's grand jury appearance. The fact that the "truth averment" was not substantiated until after Frank Serafini testified does not preclude the government from relying on it to support its prosecution. Indeed, because a grand jury interrogation is not to be used to trap a witness into a perjury charge, *Slawik,* 548 F.2d at 84, it is to be anticipated that the "truth" will not be substantiated until after the alleged perjurer testifies. Further, that portion of the indictment alleging that Frank Serafini perjured himself regarding his knowledge of "another check" (Statement 3) has already been dismissed from the indictment. The only other statement that relates to Thomas Harrison is Statement 2. In that instance, Frank Serafini was questioned whether he knew why Michael Serafini had given him a check for $2,000, rather than $1,000, which would represent Frank Serafini's contribution. This was a precise question without any ambiguity. If the extra $1,000 was included to reimburse Thomas Harrison, then Frank Serafini could have answered the question truthfully. There was no need for the government to specifically ask Frank Serafini about Thomas Harrison in the context of Statement 2 because Frank Serafini made clear that the $2,000 check had *no* connection to the Dole Committee. Under these circumstances, the government's failure to question Frank Serafini concerning Thomas Harrison does not constitute a due process violation.

Fifth, defendant Frank Serafini claims that the prosecutor improperly examined him regarding his personal income as well as the income of his family. Mr. Serafini claims that this line of questioning was intended to inflame the grand jury. First, it is not apparent how this financial information would be prejudicial, unless it is assumed that the grand jurors harbored some form of "class envy." Such an assumption would run directly contrary to the presumption of regularity that attaches to grand jury proceedings. As noted earlier, the government was attempting to demonstrate the strong financial interest that defendant Frank Serafini had in Empire Sanitary Landfill. This financial affiliation was relevant to explain why he may have been reimbursed as a conduit contributor. This line of questioning was not improper and does not support a due process violation.

Sixth, defendant Frank Serafini claims that the prosecutor improperly examined him regarding political issues and the rights of his constituents to get information about him from the press. A review of the grand jury transcript demonstrates that the government did not question defendant Frank Serafini about any political views or issues. As to the rights of defendant Frank Serafini's constituents, this question came during the interchange regarding defendant Frank Serafini's financial interest in Empire Sanitary Landfill and his representations concerning those interests in the local media. It cannot reasonably be maintained that this isolated statement constituted a due process violation.

██ Finally, Mr. Serafini alleges that the prosecutor improperly probed into his privileged relationship with his attorney. The prosecutor did question defendant Frank Serafini as to who was paying his attorney's fees. During the grand jury process, it was determined that such information was not privileged and that the government could inquire as to third party payment of legal fees for the grand jury witnesses. Therefore, the government did not commit a due process violation when it questioned Mr. Serafini concerning the manner in which his attorney was being compensated.

In short, Mr. Serafini has failed to demonstrate that any of the allegedly improper conduct on the part of the prosecutor casts "grave doubt" upon the independence of the grand jury's decision to indict him. *See Bank of Nova Scotia*, 487 U.S. at 255–56, 108 S.Ct. 2369. Therefore, Frank Serafini's motion to dismiss the indictment based upon alleged prosecutorial misconduct must fail.

## B. Motion for a Bill of Particulars

██ Federal Rule of Criminal Procedure 7(f) allows a court to direct the filing of a bill of particulars.[12] A motion for a bill of particulars may be made before the arraignment, within ten days after the arraignment or at a later time as the court may permit. Granting a bill of particulars is a matter within the broad discretion of the trial court. *United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir.), *cert. denied*, 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991). "The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him [so that he may] adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described defense." *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.1971)

(quoting *United States v. Tucker*, 262 F.Supp. 305, 308 (S.D.N.Y.1966)), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *see also Eufrasio*, 935 F.2d at 575; *Rosa*, 891 F.2d at 1066; *United States v. Adams*, 759 F.2d 1099, 1113 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. McDade*, 827 F.Supp. 1153, 1187 (E.D.Pa. 1993), *aff'd in part, appeal dismissed in part*, 28 F.3d 283 (3d Cir.1994), *cert. denied*, 514 U.S. 1003, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995); *United States v. Joseph*, 510 F.Supp. 1001, 1005 (E.D.Pa.1981). In determining whether to grant a motion for a bill of particulars, a trial court must strike a "prudent balance" between the defendant's interest in securing information and the government's interest in not committing itself to facts before it is in a position to do so. *Rosa*, 891 F.2d at 1066.[13]

██ A bill of particulars is not intended to provide the defendant with the fruit of the government's investigation, but is instead intended to give the defendant the minimum amount of information necessary to permit the defendant to conduct his own defense. *United States v. Smith*, 776 F.2d 1104 (3d Cir.1985); *see Sourlis*, 953 F.Supp. at 579 (holding that a bill of particulars, unlike discovery, is not intended to provide the defendant with the results of the government's investigation); *Caruso*, 948 F.Supp. at 393 (same); *see also Eufrasio*, 935 F.2d at 575 (finding that a defendant is not entitled to "a preview of the government's case or wholesale discovery of the prosecutor's file"); *United States v. Giampa*, 904 F.Supp. 235, 280 (D.N.J.1995) ("Although Rule 7(f) is construed liberally, it does not permit defendant to receive wholesale discovery of the Government's evidence."); *McDade*, 827 F.Supp. at 1153 (same); *Joseph*, 510 F.Supp. at 1005 (same). A bill of particulars should be grant-

---

**12.** Prior to 1966, a moving party had to demonstrate cause in order to obtain a bill of particulars. *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir.1989). The 1966 amendment to Rule 7(f) took a more liberal attitude by eliminating the cause requirement. *Id.; see also United States v. Sourlis*, 953 F.Supp. 568, 578 (D.N.J.1996); *United States v. Caruso*, 948 F.Supp. 382, 393 (D.N.J.1996).

**13.** The bill of particulars is designed to define and limit the government's case. Generally, when a bill of particulars is furnished to a defendant, the government is strictly limited at time of trial to the particulars which it has specified. *See Smith*, 776 F.2d at 1111; *United States v. Neff*, 212 F.2d 297, 309 (3d Cir.1954); *United States v. Haskins*, 345 F.2d 111 (6th Cir.1965).

ed where the indictment is too vague or indefinite to reasonably allow a defendant to prepare his defense. *See Addonizio,* 451 F.2d at 64; *Giampa,* 904 F.Supp. at 280; *United States v. Nacrelli,* 468 F.Supp. 241, 250 (E.D.Pa.1979), *aff'd mem.,* 614 F.2d 771 (3d Cir.1980); *United States v. Feliziani,* 472 F.Supp. 1037, 1045 (E.D.Pa.1979), *aff'd mem.,* 622 F.2d 580 (3d Cir.1980); *United States v. Bloom,* 78 F.R.D. 591, 599 (E.D.Pa. 1977). As summarized by the Third Circuit:

> A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation.

*Smith,* 776 F.2d at 1111 (citations omitted) (emphasis in original); *see also Caruso,* 948 F.Supp. at 393 (finding that an indictment must only provide a minimal amount of information that allows a defendant to conduct his or her own investigation).

■ Frank Serafini argues that he cannot adequately prepare his defense because "the Indictment insufficiently informs the Defendant as to the nature of the falsehoods allegedly sworn to before the Grand Jury." (Def's Mot. (Dkt. Entry 30) ¶ 1.) For instance, Mr. Serafini requests that the government indicate its understanding of the following phrase: "and I was not reimbursed for any contributions." (Def's Mot. (Dkt. Entry 30) ¶ 1(a).)

■ Contrary to Mr. Serafini's assertion, the government is under no obligation to interpret in a bill of particulars the alleged perjurious phrases. The indictment clearly alleges that Frank Serafini made false statements to the grand jury and it identifies with requisite precision the alleged false statements. The record of the grand jury proceedings speaks for itself. Whether Frank Serafini understood the questions and whether his responses were perjurious ultimately lies within the province of the petit jury.[14]

---

14. Mr. Serafini primarily relies upon two district court cases from the early 1950s. In *United States v. Lattimore,* 112 F.Supp. 507 (D.D.C. 1953), *aff'd in part, rev'd in part,* 215 F.2d 847 (D.C.Cir.1954), the defendant had been charged with perjury in connection with statements he made to a McCarthy era Senate Committee investigating the defendant's connections with the Communist Party. The defendant was not charged with perjury for his denial that he was a communist; rather, the perjury charges related to his knowledge and associations with other known communists. The court determined that the government had to provide the defendant with particulars as to how the government knew that the individuals were communists. More-over, the court required the government to define the word communist. *Id.* at 520. Finally, the court required the government to identify certain "overt acts" upon which the government relied to demonstrate that the defendant had perjured himself. *Id.* This case is easily distinguishable from *Lattimore.* First, the term "communist" certainly was open to wide interpretation during the McCarthy era. Given the ambiguous nature of the term "communist," it is not surprising that the government was required to provide more detailed definition. Furthermore, it does not appear that the indictment in *Lattimore* contained a truth averment. Thus, the court required the government to demonstrate the overt acts upon which it based its perjury charges. In this case, however, the government has included a truth averment which demonstrates the manner in which Mr. Serafini's statements were false. Furthermore, the term reimbursement has a well-

established common meaning and there is no need for the government to define the term.

The other case upon which Mr. Serafini relies is *United States v. Haas,* 126 F.Supp. 817 (S.D.N.Y.1954). In that case, the court determined, with little analysis of the facts, that the indictment "contain[ed] some ambiguity as to the nature of the falsehoods allegedly sworn to before the Grand Jury." *Id.* at 818. No such ambiguity exists in this case. The government has made clear through the indictment and its subsequent filings that Count 140 relates to allegedly perjurious statements concerning Mr. Serafini's reimbursement for his contribution to the Dole Committee. As noted earlier, with the exception of Statement 3, the indictment is not ambiguous. Mr. Serafini is aware of the government's charges and has sufficient information to begin his defense. It should be noted, however, that the motion for a bill of particulars was made *before* the government complied with its discovery obligations. Therefore, since the filing of his motion for a bill of particulars, Mr. Serafini has received the benefit of the government's discovery disclosures.

As noted throughout this opinion, the indictment is clear as to the charges as well as the basis for those charges. Mr. Serafini allegedly gave perjurious testimony to the grand jury when he denied that he had been reimbursed for his contribution to the Dole Committee. With the exception of Statement 3, the indictment is not ambiguous. To this extent, it is difficult to understand the exact nature of Mr. Serafini's request for a bill of particulars in that it is not

Mr. Serafini also requests the government to identify any "irreconcilably contradictory declarations" that he made ·before the grand jury. (Def's Mot. (Dkt. Entry 30) ¶¶ 2–3.) The government has indicated that it does not intend to rely upon any inconsistent declaration to establish the alleged · perjury. (Govt's Opp. Brf. (Dkt. Entry 45) at 9.) Given the government's representation, this request is moot.

■ Mr. Serafini then asks that the government be required to describe "why it was material to the [grand jury] investigation" that he was reimbursed for political contributions, that he acted as a conduit for illegal contributions, and that he solicited and reimbursed a contribution from his legislative aide. (Def's Mot. (Dkt. Entry 30) ¶¶ 4–7.) The indictment provides the following explanation of materiality:

> At the time and place aforesaid, the grand jury was conducting an investigation to determine whether violations of Title 2, United States Code, Sections 431, et seq. ("the Campaign Act") had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations. It was material to the said investigation that the grand jury ascertain if Frank Serafini was reimbursed in connection with any political contributions he ever made, or whether he otherwise acted as a conduit, or caused others to act as conduits.

(Indictment (Dkt. Entry 1) Count 140, ¶ 3.) Prior to his grand jury testimony, Mr. Serafini undoubtedly knew, both from press reports and from the grant of immunity extended to him, that the grand jury was investigating illegal campaign contribution practices by Empire Sanitary Landfill, i.e., that Empire Sanitary Landfill, which was barred from making campaign contributions under federal law, was reimbursing its employees and close associates for making campaign contributions on its behalf. His testimony that he was not reimbursed for his contributions was plainly related to the grand jury investigation. Further, the in-

dictment provides detailed information concerning the grand jury's investigation, which also provides a basis for the government's contention that his testimony was material. (Indictment (Dkt. Entry 1) ¶¶ 1–136.) Therefore, contrary to Frank Serafini's contention, the indictment does offer a clear and precise· statement concerning materiality. Accordingly, the request for a bill of particulars as to the materiality of allegedly false statements will be denied.

■ Mr. Serafini also requests that the government be required to disclose the "date, manner and method" evidence which the government intends to rely upon to demonstrate that he perjured himself. (Def's Mot. (Dkt. Entry 30) ¶¶ 8–10.) As noted earlier, the purpose of a bill of particulars is not to provide a defendant with wholesale access to the government's files. *Eufrasio*, 935 F.2d at 575; *Giampa*, 904 F.Supp. at 280 ("Although Rule 7(f) is construed liberally, it does not permit defendant to receive wholesale discovery of the Government's evidence."); *McDade*, 827 F.Supp. at 1153 (same); *Joseph*, 510 F.Supp. at 1005; *see also Sourlis*, 953 F.Supp. at 579 (holding that a bill of particulars, unlike discovery, is not intended to provide the defendant with the results of the government's investigation); *Caruso*, 948 F.Supp. at 393 (same). If a defendant has sufficient information to understand the charges alleged in the indictment and to conduct his or her own investigation of those charges, a court should not require the government to prepare a bill of particulars. *See Smith*, 776 F.2d at 1111; *see also Caruso*, 948 F.Supp. at 393 (finding that an indictment must only provide a minimal amount of information that allows a defendant to conduct his or her own investigation). In this case, the indictment, particularly paragraphs 94, 95 and 115 on pages 25–26 and 28, provided sufficient detail to enable Mr. Serafini to undertake an investigation of the charges and prepare his defense. Therefore, his motion for a bill of particulars regarding the

apparent what the government would provide in addition to the information already provided to Mr. Serafini.

government's evidence that his statements were perjurious will be denied.

Finally, Mr. Serafini requests that the government be required to identify whether or not it intends to rely upon any alleged false statements aside from those included in the indictment. (Def's Mot. (Dkt. Entry 30) ¶ 11.) The government has represented that: "[t]he indictment makes clear that it is only the underscored portions of the defendant's testimony which the grand jury alleged to be perjurious." (Govt's Opp. Brf. (Dkt. Entry 45) at 11.) Therefore, this request is moot.

As noted herein, with one exception, the false statements charged in the indictment are not fundamentally ambiguous.[15] The government is under no obligation to interpret the pertinent questions and answers. The indictment makes clear that the grand jury believed that defendant Frank Serafini made false statements and identifies the statements that are believed to be false. Because the indictment has satisfactorily presented sufficient information to permit Mr. Serafini to conduct his own investigation, his request for a bill of particulars will be denied.

### C. Motion for Misjoinder under Rule 8(b)

■■■ Federal Rule of Criminal Procedure 8(b) provides:

> Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in *the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.* Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count. [Emphasis added.]

A misjoinder motion is properly addressed to the indictment, as opposed to the evidence that may be produced at some later time. *See United States v. Sourlis,* 953 F.Supp. 568, 575 (D.N.J.1996). Rule 8 authorizes

joinder if the indictment alleges multiple offenses that share the same "transactional nexus." *Eufrasio,* 935 F.2d at 570 n. 20. Counts that concern "a single series of related acts" are properly joined in an indictment. *Id.* at 570–71. In this regard, " 'transaction' is a flexible concept which 'may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.' " *United States v. Mebust,* 857 F.Supp. 609, 613 (N.D.Ill.1994) (quoting *United States v. Berardi,* 675 F.2d 894, 899 (7th Cir.1982)). Joinder of a perjury count may be appropriate where the allegedly "false declarations concern the substantive offense." *United States v. Potamitis,* 739 F.2d 784, 791 (2d Cir .), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984).

Mr. Serafini contends that the requisite inter-relationship between his perjury count and the other 139 counts in the indictment sufficient to warrant their joinder is missing. In support of this contention, Mr. Serafini persuasively contends that (a) there is no common plan or scheme alleged on the face of the indictment that would encompass the perjury charge (Def's Supp. Brf. (Dkt. Entry 49) at 6); (b) the elements of the perjury count are separate and distinct from the elements of the counts pertaining to campaign contribution violations (*id.*); (c) the perjury count cannot be construed as part of a common scheme or plan as it is not temporally related to the alleged campaign contribution conspiracy, i.e., the alleged perjury occurred nearly one year after the last alleged act in the conspiracy (*id.* at 7); (d) the proof involved in the other 139 counts has little, if any, bearing upon the perjury charge (*id.* at 8); and (e) there is no evidence that suggests that he was aware of Empire's conduct with respect to its employees.

In response, the government contends with equal persuasiveness that the requisite relationship between Count 140 and the rest of the indictment is established by the fact that Frank Serafini was an "unindicted co-con-

---

**15.** As to Statement 3, it has been determined that this portion of the indictment is ambiguous and has been taken out of context. Therefore, that portion of the indictment will be dismissed. Be-

cause that portion of the indictment is being dismissed, there is no need for a bill of particulars as to Statement 3.

spirator." [16] In other words, the government contends that Mr. Serafini not only acted as a conduit and received reimbursement, but that he actively participated in the conspiracy, i.e., he solicited Thomas Harrison to make a contribution to the Dole Committee and then reimbursed him for that contribution. The government notes that other courts have held a perjury count is properly joined with conspiracy counts, especially where the proof of the conspiracy is necessary to prove the perjury count. *See United States v. Shorter*, 54 F.3d 1248, 1256 (7th Cir.), *cert. denied*, 516 U.S. 896, 116 S.Ct. 250, 133 L.Ed.2d 176 (1995); *United States v. Curry*, 977 F.2d 1042, 1048 (7th Cir.1992), *cert. denied*, 507 U.S. 947, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993); *United States v. Swift*, 809 F.2d 320 (6th Cir.1987); *United States v. Dekle*, 768 F.2d 1257 (11th Cir.1985).

The cases cited by the government, however, are not clearly on point. For example, in *Shorter*, the defendant moving for misjoinder was not even charged with perjury; rather, he moved for misjoinder because he did not want to go to trial with the other defendant, who had been charged with perjury, because he feared the jury would infer that he was also a liar. *Shorter*, 54 F.3d at 1258. In *Curry*, the defendants had a pre-conceived plan, as part of the overall conspiracy, that they would lie if caught and tell the authorities that the leader of the conspiracy was "Richard Kelly," a fictional character. *Curry*, 977 F.2d at 1049. Thus, the perjurious statements in *Curry* were actually part of the original conspiracy. In *Swift*, the defendant seeking severance was charged with *both* participation in the conspiracy and making false declarations to the grand jury regarding his participation in the conspiracy. *Swift*, 809 F.2d at 321–22. Here, by way of contrast, Mr. Serafini is not charged with making false statements in relation to his alleged role in the conspiracy. As pointed out by Mr. Serafini, "[a]lthough the transcript of Mr. Serafini's grand jury testimony reveals that Mr. Serafini pointedly denied knowledge of the conspiracy, this testimony

does *not* form the basis for the charge of perjury." (Def's Reply Brf. (Dkt. Entry 118) at 12 (emphasis in original).) *Dekle* involved a defendant who aided some of the conspirators without actually joining the conspiracy. The defendant later denied his participation in the conspiracy. *Dekle*, 768 F.2d at 1257. Because the proof necessary to support the perjury charge required the same proof necessary for one aspect of the conspiracy; the court determined that the claims arose out of the same transaction and allowed joinder. *Id.* at 1260–61. In this case, by way of contrast, the indictment does not charge that Frank Serafini lied to conceal his role in the conspiracy. Nor does the indictment allege that Frank Serafini was a participant in some plan or scheme to conceal the conspiracy.

Mr. Serafini relies upon *United States v. Slawik*, 408 F.Supp. 190 (D.Del.1975), *aff'd mem.*, 564 F.2d 90 (3d Cir.1977), to argue that the perjury charge in this case is not properly joined. In *Slawik*, the grand jury returned a 13–count indictment against four defendants. *Id.* at 196.[17] The principal thrust of the indictment was that the defendants had conspired to bribe, threaten and convince certain witnesses to refuse to cooperate with a law enforcement investigation. Counts 1, 2 and 3 charged that, from May 1974 through October 1974, all of the defendants conspired to convince a witness, Bayard Austin, not to cooperate with the authorities. *Id.* at 197–98. Counts 7, 8 and 9 charged defendant Slawik with falsely testifying before the grand jury in December of 1974 concerning the attempts to influence Austin's testimony. The district court reviewed the indictment and concluded:

Absent from either the multi-defendant counts or the single defendant counts of the instant indictment are cross references or other allegations which explicitly tie into the same "series of acts or transactions" ... [the] telephonic communications with Austin (Counts 1, 2 and 3) [with] Slawik's alleged perjury before the grand jury in Delaware (Counts 7, 8 and 9).... The

---

**16.** This term has been stricken from the indictment as its inclusion was violative of the prohibitions established in *United States v. Briggs*, 514 F.2d 794 (5th Cir.1975).

**17.** Slawik was the only defendant named in all of the counts. *Id.* at 197.

Court is also unable to imply or infer that each count relates to "the same series of acts or transactions," as required by Rule 8(b), F.R.Cr.P ., for careful review of the indictment shows only ... that from May 1974 until October 1974 Slawik, Capano, Uffelman and Rappa conspired to prevent Austin from testifying before the federal grand jury in Delaware and also prevented Austin from communicating with the FBI ... [and] that on December 10, 1974 Slawik testified falsely before the federal grand jury about his trip to Orlando, Florida to visit Austin, Rappa's involvement with Austin, and the financing of Austin's home in Orlando .....

.... Finally, the Court holds that Counts 7, 8 and 9 are not part of the "same series of acts or transactions" as Counts 1–3. There is authority to the effect that joinder is proper under Rule 8(b) "if 'a direct connection [exists] between each of the perjury charges and one or more of the overt acts connected with ... [a] conspiracy count,' " .... However, [those authorities], and most of the other cases cited therein arose in situations where each defendant, named in a conspiracy count, was also charged with having committed perjury about the same subject matter charged in the conspiracy count. Here, each of the defendants named in Counts 1, 2 and 3 (other than Slawik) who could have brought a Rule 8(b) motion has objected in some fashion to the joinder of Counts 7, 8 and 9 with Counts 1, 2 and 3, and despite some common facts underling the two sets of counts, the offenses charged in each count are not part of "the same series of acts or transactions."

*Id.* at 213–14 (citations omitted).

As in *Slawik*, the indictment in this case lacks any "cross references" between Mr. Serafini's alleged perjury and the overall conspiracy. The perjury is not claimed to be an overt act in furtherance of the conspiracy. Nor can it be said that Frank Serafini's grand jury appearance was part of the same series of acts or transactions that comprise the underlying offenses.

The indictment does, however, link Frank Serafini to the underlying conspiracy through the Harrison transaction. This allegation, of course, does not support an inference that Frank Serafini was a knowledgeable participant in the overall scheme. Thus, while the Harrison transaction is present in both the conspiracy count and the perjury count, it is indeed a slender "common thread" by which to append the perjury count to the indictment, especially in the absence of any statement in the indictment from which it may be inferred that the alleged perjury was part of the same series of transactions. *See United States v. Coleman*, 497 F.Supp. 619, 621–22 (N.D.Ill.1980) (false declarations charge not plainly related to postal fraud counts).·

Since *Slawik*, a more liberal approach to Rule 8(b) issues may be discerned in the case law. *See, e.g., Sourlis*, 953 F.Supp. at 575. Thus, while the rationale of *Slawik* supports a determination that Count 140 is not properly joined, its persuasiveness is undercut by the more liberal attitude toward joinder that follows from the strong public policy favoring joint trials. *See Zafiro v. United States*, 506 U.S. 534, 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In short, although the facts underlying the perjury charge may not be part of the same series of acts or transactions underlying the other 139 counts in the indictment, there is some nexus between the other counts and the allegation that Frank Serafini lied about being reimbursed for his contribution to the Dole Committee. Whether that nexus is strong enough to permit joinder, however, need not be decided in this case because, even if joinder is proper, a severance of Count 140 under Rule 14 of the Federal Rules of Criminal Procedure is warranted.

### D. Motion for Severance under Rule 14

▉ Under Federal Rule of Criminal Procedure 14, a district court may grant severance "if it appears that a defendant or the government is prejudiced by a joinder." As noted above, there is, however, a strong public policy which favors joint trials. *Zafiro*, 506 U.S. at 538–39, 113 S.Ct. 933. As a general rule, defendants indicted together should be tried together. *Eufrasio*, 935 F.2d at 568. Accordingly, the party who seeks severance bears the burden of demonstrating

that a joint trial will cause clear and substantial prejudice, resulting in a manifestly unfair trial. *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996).

■ Even where prejudice has been shown, Rule 14 does not require severance if the district court determines that other relief can be properly granted. *Zafiro,* 506 U.S. at 538–39, 113 S.Ct. 933 (specifically noting that relief can properly be granted through limiting instructions); *Voigt,* 89 F.3d at 1096 (noting the effectiveness of a limiting instruction which directed the jury to consider each count separately and that the guilt of one defendant did not affect the guilt of the other defendant); *United States v. Console,* 13 F.3d 641, 655–56 (3d Cir.1993) (stating that a limiting instruction can help the jury "compartmentalize" the evidence as it pertains to each defendant), *cert. denied,* 513 U.S. 812, 115 S.Ct. 64, 130 L.Ed.2d 21 (1994). As the Supreme Court has noted, "a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 538–39, 113 S.Ct. 933; *United States v. Balter,* 91 F.3d 427, 432 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 518, 136 L.Ed.2d 406 (1996); *Voigt,* 89 F.3d at 1094.

Mr. Serafini relies primarily upon *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to support his claim that joinder is prejudicial. In *Kotteakos,* an individual loan officer, Simon Brown, devised a scheme whereby he assisted individuals to lie on their loan applications and then took a portion of the proceeds from the loan in return for his service. *Id.* at 753, 66 S.Ct. 1239. Brown worked this scheme with numerous individuals, none of which had any knowledge of the others. *Id.* at 754. The government brought a single conspiracy claim against the individuals who had dealt with Brown, claiming that the case involved "that of separate spokes meeting in a common center." *Id.* at 755, 66 S.Ct. 1239. Because the individual defendants had no connection with one another, the Court determined that a joint trial was prejudicial and reversed the convictions. *Id.* at 773–74, 66 S.Ct. 1239. The Court noted that such mass trials have an inherent danger of guilt by association that runs counter to the principle of determination of individual guilt. *Id.*[18]

Mr. Serafini contends that a joint trial in this case will also result in guilt by association. In this regard, he argues that the indictment has alleged that he is a mere spoke protruding from the hub of the conspiracy. There is no allegation that he knew about the overall scheme or the extent of Empire's efforts. The government only has alleged that he solicited one potential conduit. As such, Frank Serafini claims that any conspiracy that he allegedly took part in was separate and distinct from the larger overall conspiracy. As a result of his minor participation in the separate and smaller "spoke" conspiracy, Mr. Serafini contends that there is a substantial danger that he will be convicted solely upon his association with the other co-defendants. He also argues that most of the evidence admissible against his co-defendants would not be admissible against him and that he will be prejudiced by this "spill-over" of evidence. In this regard, Mr. Serafini contends that evidence regarding the conduit witnesses would not be admissible against him because he had no knowledge that those witnesses were reimbursed for their contributions. Finally, he argues that his right to a speedy trial will be compromised if he is required to remain with the other defendants.[19]

---

**18.** *Kotteakos* did not involve consideration of Rule 8 or Rule 14. Rather, the decision was based upon consideration of whether a joint trial was "harmless error." *Id.* at 757, 66 S.Ct. 1239. Thus, the Court's opinion was based solely upon principles of fairness.

**19.** The other defendants have indicated that they intend to challenge the constitutionality of the Federal Election Campaign Act through pre-trial motions that may require an evidentiary hearing. Mr. Serafini has waived any constitutional challenge and emphasizes that he is a public official facing a November election. As such, he claims to desire a speedy trial to vindicate his name prior to the November election.

In response, the government contends that there is no danger of any "spill-over" of evidence. In this regard, the government contends that all of the conduit activity is admissible against Frank Serafini. The government contends that the evidence that conduits were reimbursed is necessary circumstantial evidence that defendant Frank Serafini was reimbursed and will be used to demonstrate the falsity of the alleged statements, i.e., the fact that 50 other conduit witnesses were reimbursed for their contributions makes it more likely that Frank Serafini was also reimbursed.[20] The government maintains that the jury will be able to properly compartmentalize the evidence applicable solely to Mr. Serafini and that any potential prejudice can be easily overcome by a limiting instruction.

As noted above, the potential common thread for the purposes of joinder under Rule 8(b) is exceptionally thin. The government has appended defendant Frank Serafini to a substantial conspiracy to violate federal election laws without any direct allegation that he had any knowledge concerning Empire's alleged illegal activities. Further, there is no averment that Frank Serafini participated in the *nine* other alleged illegal contribution schemes directed at campaigns other than the Dole Committee.

Furthermore, it is not apparent that evidence concerning the conduit witnesses will be admissible against defendant Frank Serafini to prove that he was in fact reimbursed.[21] First, most of the alleged conduit witnesses are in a different position than Frank Serafini because they were employees of Empire Sanitary Landfill. The fact that Empire was reimbursing its employees does not necessarily mean that it would reimburse Frank Serafini. To this extent, the closest analogous class of conduit witnesses to Frank Serafini would be the other Serafini family members who allegedly made contributions. Further, there will be evidence of nine other candidates to whom illegal contributions were allegedly made without any evidence that Frank Serafini took any part in those contributions.[22] Finally, many of these reimbursement checks to other conduit witnesses will not be from the same "sequence" of checks as the check from Michael Serafini or may not even be written by Michael Serafini.[23] Given the serious evidentiary concerns and the potential "spill-over" effect, Mr. Serafini will suffer clear and substantial prejudice if required to be tried jointly with the remaining defendants.[24]

**20.** Under 18 U.S.C. § 1623, the government is permitted to prove its perjury charge through the use of circumstantial evidence. *See United States v. Roche*, No. 91–595–13, 1992 WL 129634, at *5 (E.D.Pa. June 9, 1992) (noting that § 1623 does not require the "two witness" rule and that any type of evidence can be used to prove the perjury charge).

**21.** The parties have not completely briefed this issue and it would be inappropriate to make a definitive ruling on it at this juncture in the proceedings.

**22.** The government's contention that the Dole contributions dominate this case and that no additional witnesses will be called to prove the other alleged incidents does not cure the prejudice that Frank Serafini potentially faces when being tried with a group of defendants who made numerous illegal contributions to various campaigns over several years.

**23.** From a review of the grand jury transcript, it appears the $2,000 check for defendant Frank Serafini was within a numerical series of checks that included other conduit witnesses who will testify that their checks were reimbursements for contributions to the Dole campaign. To this extent, the evidence of these checks within the same numerical sequence as the one defendant Frank Serafini received may be more probative than checks to conduit witnesses from another sequence during another time frame from another defendant.

**24.** It appears that the government has independent evidence relative to only Frank Serafini which weakens the government's claim that it will be required to present the same proof as to all of the defendants. In terms of Frank Serafini, the government can call Thomas Harrison to testify that Frank Serafini solicited a campaign contribution of $1,000 for the Dole campaign. Further, the government can also elicit testimony from Thomas Harrison that Frank Serafini reimbursed him for the contribution. The government also has the check that Frank Serafini made out to the Dole campaign for $1,000 and the check that Frank Serafini received from Michael Serafini for $2,000. As to the evidence regarding (1) other conduit witnesses with no relation to Frank Serafini, (2) contributions made at different times, (3) contributions made to different candidates, and (4) checks written by defendants other than Michael Serafini, such evidence has less probative value in relation to Frank Serafini.

Speedy trial concerns also support severance. As noted, Mr. Serafini's co-defendants intend to challenge the constitutionality of the Federal Election Campaign Act and have predicted a lengthy and protracted legal battle. Frank Serafini has waived any right to make a constitutional challenge and asserts, instead, his constitutionally protected right to a speedy trial. Moreover, the public has an interest in having criminal charges decided expeditiously. This public interest is heightened where, as here, an elected official stands accused. Prompt resolution of charges against an elected official better informs the citizens in the exercise of their right to vote. Although research has not uncovered any reported cases in which the right to a speedy trial was cited as a grounds for severance under Rule 14, *Zafiro* makes clear that severance is warranted where a joint trial would compromise a specific trial right. *Zafiro*, 506 U.S. at 538–39, 113 S.Ct. 933. Therefore, both Frank Serafini's and the public's interests in a speedy trial weigh heavily in favor of severance under Rule 14.

Finally, as noted in *Kotteakos,* it is not appropriate to attempt to try multiple conspiracies together simply because there is a common actor in all of the conspiracies. In this case, Michael Serafini is the common actor. According to the indictment, Frank Serafini had an extremely limited role in the alleged overall conspiracy. His efforts resulted in roughly one percent of the total illegal contributions that were made throughout the entire conspiracy.[25] Further, the other counts have no substantial connection to Frank Serafini. At best, Frank Serafini is a "spoke" arising from a large "hub" of a wide-reaching conspiracy involving separate agreements with over 40 other conduit participants. The indictment fails to allege any facts that would support a finding that Frank Serafini was actively involved in the overall conspiracy. Under these circumstances, the potential for a finding of guilt by association is too great. For all of these reasons, Count 140 will be severed from the indictment and Frank Serafini will receive a separate trial.

## III. CONCLUSION

Frank Serafini's arguments concerning the ambiguity of the questions used by the prosecutor as well as his alleged misunderstanding of the term "reimbursement" cannot support a claim for dismissal of Statements 1, 2, 4 and 5. A review of the grand jury transcript demonstrates that ordinary men could reasonably agree that Frank Serafini and the prosecutor understood each other. Therefore, Frank Serafini's arguments concerning the ambiguity of the questioning and his alleged misunderstanding are properly directed to the petit jury. Therefore, his motion to dismiss the indictment will be denied.

As to Statement 3, however, Frank Serafini has correctly noted that this portion of the indictment does not support a perjury charge as it is ambiguous and unclear. In this regard, the indictment took this portion of the exchange between the prosecutor and Frank Serafini out of context to make Frank Serafini's answer appear broader than a fair reading of the grand jury transcript will support. Because the prosecutor failed to demonstrate with clarity that he was seeking more expansive information regarding other checks relating to the Dole Committee, other than reimbursement checks that Frank Serafini may have received from Michael Serafini, Statement 3 cannot support a perjury charge and will be stricken from the indictment.

With the exception of Statement 3, the indictment provides clear information of the government's case. It alleges that Frank Serafini made false statements concerning his reimbursement for his Dole contribution as well as false statements regarding his knowledge of the purpose for the $2,000 check from Michael Serafini. The indictment provides sufficient information to enable Frank Serafini to undertake his own investigation. Therefore, Frank Serafini's motion for a bill of particulars will be denied.

Although there is a substantial question as to whether Count 140 is properly part of the indictment, the potential prejudice to Frank

---

**25.** By way of contrast, Lou and Stacey Selig made over three times the amount in contributions over four separate campaigns than the amount for which Frank Serafini was allegedly responsible.

Serafini from a joint trial is substantial. Frank Serafini is charged in a single count of a 140 count indictment. If there is a joint trial, Frank Serafini will be associated with four co-defendants charged with extensive campaign contribution violations spanning several years and involving 10 candidates. Frank Serafini is purportedly responsible for only $2,000 in relation to *one* campaign, as opposed to the other defendants' alleged responsibility for over $100,000 of illegal campaign contributions to *ten* separate campaigns. Although the government contends that Frank Serafini was an active participant, his alleged "actions" pale in comparison to those of his co-defendants. Further, both Frank Serafini and the public have an important interest in a speedy trial, while his co-defendants have indicated their intention to challenge the constitutionality of the Federal Election Campaign Act through pre-trial motions that may require an evidentiary hearing. There is also substantial danger that a "spill-over" of evidence will occur in a joint trial, in which evidence will be presented that would not be independently admissible against Frank Serafini. In balancing these concerns, Frank Serafini will suffer substantial prejudice in a joint trial with his co-defendants. Therefore, his motion for severance under Rule 14 will be granted. An appropriate order is attached.

### ORDER

NOW, therefore, in accordance with the attached Memorandum, it is hereby **ORDERED THAT:**

1) Defendant Frank Serafini s motion to dismiss the indictment (Dkt. Entry 46) is **GRANTED IN PART AND DENIED IN PART.** Defendant Frank Serafini's motion to dismiss the indictment as to Statement 3, as designated in the attached Memorandum, is granted. In all other respects, defendant Frank Serafini's motion to dismiss the indictment is denied.

2) Defendant Frank Serafini's motion for a bill of particulars (Dkt. Entry 30) is **DENIED.**

3) Defendant Frank Serafini's motion for misjoinder (Dkt. Entry 87) is **DISMISSED AS MOOT.**

4) Defendant Frank Serafini's motion for severance (Dkt. Entry 87) is **GRANTED.**

5) A telephonic scheduling conference will be conducted in this matter on **Friday, April 17, 1998, at 3:00 p.m.** Counsel for the government will be responsible for making the call to (717) 207–5720 and all parties shall be ready to proceed before the undersigned is contacted.